I'll hear argument in the second case on the calendar, case 24-7237, Sands v. Norman. Mr. Fogle. Good morning, Your Honors. May it please the Court, Joseph Fogle. I'll reserve seven minutes on the rebuttal, please. Oral arguments on this case are particularly appropriate because in review, the trial court did struggle with what's the legal framework for these hotly contested facts. While this is a review of a summary judgment granted, and we think that there are many facts that would wade improperly by. Counsel, if I may interrupt, if you could just clarify for me one thing. Is the claim here that there was fraud in this case? That's an excellent question. This is not a fraud pleading. It is not that fraud is required. No, I know what you're saying. If it's not required, that's fine, but your claim is not that it was fraud, correct? I need to elaborate on that. In the second phase of the interpleader, there is a question about the insured's expressed intention on the designation forms. For that, in the interpleader context, fraud, as very much comes up, is not required. Fraud is not involved. The question is whether it's a false document, whether that document reflects the actual intent of the insured. Fraud. Right, but I just, again, if it's not fraud, then is it a new influence, is it identity theft? I just want to make sure I understand what your legal theory is, so that we can put the facts that you allege are the basis for the dispute and inappropriate for summary judgment in clear view. So I want to make sure I understand that. So if it's not fraud, then is it undue influence, is it identity? What is it that your theory is? I'm drawing a difference between false documents, which do not express the intention of the allegations of fraud for additional damages beyond the insurance benefits that are at stake in an interpleader. Many times district courts grapple with allegations of fraud to obtain additional damages against the other party. Those allegations have to be made with specificity, with intent, and be tied to the wrongdoer because additional damages are involved. Here, fraud is not the issue. The issue is whether these documents, electronic and paper, whether they represent an expression of the insured's intent. And it's only about the money that the insurance company has deposited with the court. Those, that claim, those funds, it's not to seek additional funds from the other side. It's about ---- I share the concern here, which is, are you arguing incapacity? There is a question of incapacity that presented in this case, definitely early on. The heart of this case, though, is that the documents on which the other side relies are false documents, not fraudulent documents, because my side does not have to prove fraud. We have to prove that those documents upon which Ms. Sands relies are false documents. They are not an actual expression of the insured's intent. By which you mean coerced, essentially? That somehow she got Mr. Baxley to list her as the beneficiary on the insurance when that was not really what he was planning to do or wanted to do? That's the argument? False documents can have several different legs to support on. One is exactly that, that there's undue influence, that there's coercion. Another can be that a person lacks capacity to know what they're doing and they're signing or sending in things. So which are you alleging? I'm alleging that these are false documents, not fraudulent documents, because I don't want to have to show the additional standards for fraud. I just want to show that these are false documents and not an expression of the insured's intention. Just to be clear, your theory is not fraud, it's not incapacity, it's not undue influence, right? I mean, don't say it's false, I understand what you're saying with the false documents, but I just want to make sure that we understand your legal theory and what it's not. The facts in this case initially presented as facts that were likely incapacity or undue influence. An ill man in the last months of his life, a flurry of communications with the insurance company making changes that a fact finder just can't find credible. But the legal theory later, especially when Mrs. Guidry arrived on the scene and provided her declarations in the opposition to the summary judgment, makes it clear to our side that the documents that Ms. Sands relies upon are false documents. They're not documents that the insured actually did himself or that he would be likely to do himself. So your argument is not that of incapacity, you believe that it's the false documents argument. That's the legal theory? Yes, that's where the facts led on this case, exactly. And to sort of switch gears to the disputed facts on the summary judgment, we believe quite strongly that there's really an overwhelming number of instances where the district court weighed these facts or perhaps didn't have a strong indication from my side about how these facts were important. But there are hotly contested facts that show time and time again that the documents that Ms. Sands relies upon to seek the payment of the benefits are false documents. They're not true expressions of the insured's intent. They're from emails that he didn't use. They're from a phone number that he didn't use. They have multiple errors that the insured, as a life insurance agent, would not make. These are just questions that, at a trial of this matter, would be explored in depth. And combined with the insured's incapacity and the other facts that come out in the Guidry Declaration about the lack of a relationship with Sands, I think a full hearing at a trial would make it clear that the documents upon which Sands relies are fraud, pardon me, are false documents. And because this is simply an interpleader and doesn't go beyond the funds put into this by the insurance company, fraud as a legal theory of recovery of additional funds is not required. And additionally, finally, I would add that Ms. Sands does not have to be absolutely connected to the false documents. That is outside of the importance of whether the insured's intent is actually expressed in these documents. Whether Ms. Sands did the nefarious things that my side would seek to show at trial or not is aside from it. The question is whether these documents are a clear, true expression of the insured's  Do you want to save some time for rebuttal? Yes. Thank you. Thank you. Your Honors, Michael Hoover, Interpleader Law for Debbie Sands, I'm going to be candid with you. This case has been really difficult to litigate because we're here on appeal and I still don't know what I'm defending against. I don't know if it's an allegation of fraud. I don't know if it's an allegation of undue influence, lack of capacity. So at the trial court, we briefed all of those. We assumed it was the kitchen sink and we briefed all of them. I'm not sure what else I can do to litigate this when I don't even know the difference between a false document and a fraudulent document. I take it the position is that these documents were submitted and they don't reflect Baxley's true intent and that the reason for that is because Ms. Sands somehow got to him and changed the beneficiary. And there's not direct evidence of that, but there's evidence that it's circumstantial. So I think the legal theory could have been defined more helpfully, but the facts start to set up maybe what this is about. And so if we assume that the way you phrase it is correct, that would be undue influence. And that's what the trial court settled on. And the real problem with the undue influence claim is that you don't prove anywhere, there's no evidence of Ms. Sands doing anything. You could argue that he was vulnerable. You could argue that he was sick. Everybody agrees he was sick. You get to a really curious second element of undue influence, which is that the person has to have a confidential relationship with the sick person. So in this case, Ms. Sands says, look, we were engaged. But Mr. Norman says, no, you weren't. You weren't even near him the last month of his life. So the trial court resolved that by saying, well, we're going to just assume that he was in a relationship with Ms. Sands and we'll go ahead and concede that element. Where we ran into trouble was the third element, which is you have to show to prove undue influence that Ms. Sands actually did something. And there's been no allegation. But wasn't she involved in the trust document aspect of this? So yeah. And so what happened is when Mr. Baxley was submitting these forms, they kept being rejected. And so what the insurance company does when it rejects forms is it will send you a new blank form and they will include this trust certification form with the blank form to fill out. Now, it only applies if a person has a trust. But he had tried so many different ways of getting the beneficiary changed that he thought, okay, well, they must be telling me they want me to fill out this form. So he takes it to her. I don't know why he took it to her. I guess because he thought that trustee was, like, synonymous with beneficiary. And he says, well, you signed this. So she signed it. Importantly, that form was never accepted. So it's not even relevant. No, I know. But, I mean, and you make a plausible argument, but it just shows she was involved in some way at this point in time. The same goes for Jason Meza, who's listed, who seems to be an associate of hers but not a cousin of his. So I don't know what to make of any of this other than it seems that she's there at the time. I want to correct the Jason Meza thing. That was Eric's friend. That was not Deb's friend. I know it was alleged throughout here that that was San's associate or accomplice like that. She didn't even know this Jason Meza fellow. That was Eric's friend he played golf with. And the only reason they met each other was through Eric. But even accepting that, if she signed this trust document, what was the undue influence? If I'm dating a girl or engaged to a girl, I can ask her, hey, will you make me your beneficiary? That's not undue influence. I have to do something like say, hey, I'm not going to give you your medicine. You're going to die if you don't make me your beneficiary. I'm not going to give you food. I'm not going to take care of you. I'm not going to take you to the doctor. And there's been no allegation, much less evidence, that she did any of these things. It's all been innuendo. It's all been conclusory statements. There's just been no evidence. What about some of the circumstantial evidence, though? Like Mrs. Guidry saying that Baxley did not want to have San's around anymore. Some of the things that the insurance company reported about the irregularities of the forms and how they were submitted. The fact that this gentleman was an insurance agent. I mean, there's a lot of these different things that they're not direct proof of anything, but given all the facts and circumstances, why don't they at least create a genuine dispute here? Well, I think because we went into detail refuting those. So for example, the fact that Eric was a licensed insurance agent, he wasn't, he didn't do life insurance. He did property and casualty. Property and casualty doesn't have beneficiary designations. You know, it's for business. So your business is the insured and by default is the beneficiary. Eric had never had any experience setting up beneficiary designations. And what's interesting, I know there's been a lot of talk about how these forms were all messed up. When you really do a detailed analysis, they weren't crazy. What he was asking for was not like some weird thing. Basically he was trying to make San's the primary beneficiary of one policy and the secondary beneficiary of another policy, and he was trying to do them on one form. And the company said, look, if he had done this on two separate forms, it wouldn't have been a problem. The issue is that he was trying to do it on one form, which he had actually done before a few years earlier when he was doing something, he was making changes. What about all these issues with the e-mail address and the other address? Again, it's not just one thing, and I'm not saying any one of these is necessarily dispositive, but there's questions about each of them. Right. But again, they're just allegations. And so when you actually pull it up, one of the allegations was he had never used this e-mail address. We went and pulled, we produced documents in the litigation where he had been using that e-mail address since 2020. Including with the insurance company? Not to my knowledge, but he had certainly used it with other people. And so the idea that, the other thing that was sort of interesting is that if you look at the beneficiary changes, they didn't all benefit SANS. Like it wouldn't make any sense that she would have broken into Eric's account, gone online, or filled out these forms to make Eric's deceased father the beneficiary. And that's what half of the forms originally tried to do. And one of the forms that was accepted, she was the primary beneficiary of a policy, and then another form was submitted a couple of weeks later that actually removed her as a beneficiary. Why would a person committing fraud go in and remove themselves as a beneficiary if the whole idea is to steal all the money? It doesn't add up. What does add up is that Eric was an alcoholic. He was on, apparently according to his death certificate, he had meth in his system at the time of his death, which seems odd given that he was hospitalized. So somehow he was doing meth while he was in the hospital. This guy lived what we would probably consider to be an alternative lifestyle. He partied hard. He was only 45 when he died. Who knows what he was thinking? I mean, the bottom line is that he was changing his beneficiaries constantly. It just so happened that on the date of his death, that was the one that was listed as the beneficiary. So what do you make of the Guidry Declaration? So I think it's important to know that she has an out for Ms. Sands. They're embroiled in litigation over the estate, but most of her stuff is here. What's the nature of the other litigation? So Eric executed a will naming Deb the beneficiary of his estate, the executor and beneficiary of her estate, and she's gone into court. She's challenged it, but if you look at her declaration, she says that she's been appointed as the executor of Eric's estate, and that's just simply not true. So half the allegations in her declaration are just made up. This notion that Deb never saw him in the hospital isn't true. We provided pictures of her with him in the hospital. The idea that she wasn't his emergency contact isn't true. We provided a text message from the hospital to Deb. She just made a bunch of stuff up hoping that it would stick, and it's when you really boil down and look at the evidence, it's not true. Was she deposed? Was Deb Guidry deposed? She was never deposed. Why was that? We were going to depose her towards the end of the case, and we ran out of time. She claims that Eric wanted Sands to be out of the picture. Is that supported or contradicted? It's not supported because if you look at the record, there's actually emails that he So this idea that he had tossed her to the side and had some new girlfriend at that time is just not supported. So the one thing I kept telling the district court is, look, you don't even have to look to the credibility of Sands. Everything that we've said is backed up by some sort of evidence, whether it's the declaration of the neighbor who explained why Eric's address changed, the fact that pretty much everything that was done was backed up by evidence. And then you've got her just making conclusory statements as if they're fact, and none of them have been justified. In fact, they've been contradicted. I don't hear any other questions from my colleagues, so unless you have anything else to offer, we'll hear rebuttal. Thank you so much. Thank you.  Much of what we heard from my opposing counsel would make for a very colorful trial because all of these statements are disputed. There's evidence that the email used to change the designation is just a fake email that Mr. Baxley did not use elsewhere. The only other example of it being used is, gosh, an email to Sands, not with the insurance company. So there's evidence that's highly questionable upon which Sands relies. The phone number used to make the beneficiary designations different with the insurance company were not his phone. Ms. Guidry, his mother, had his phone after he passed away and went through the phone and declared that she and a detective went through the phone, and there was no information showing that the phone had been used to connect with Midland, the insurance company, for the electronic designation changes that are involved here. There's, Mr. Baxley was a licensed life insurance agent. That he would put on a form the same name as the primary beneficiary and then again as a contingent beneficiary, meaning if that primary was not available, is just, lacks all credibility. In this Honorable Court of Appeals, these types of factual contentions may be unusual to hear, but absolutely at a trial of this matter and more importantly upon a motion for summary judgment, there was a great deal of weighing of evidence that is beyond the scope of the Rule 56 motion. To go back to the framework that it goes into, it, the undue influence, the coercion type arguments do have an implication that the person, that the insured was involved in it in some way. The cases of Lee v. West Coast Life and Ensley and Michaelman v. Lincoln National Life, these cases do reach questions about the accuracy of the beneficiary documents themselves. Many issues come up in the second phase about those beneficiary designations, whether it's a real signature and the genuineness of the documents. And that's really to answer the question, is this an expression of the insured's intent? And here, where the district court created a fraud requirement which was beyond and higher requirement than merely showing in the second phase that these are false documents, that these are not documents that reflect Mr. Baxley's expressed intention, deprived Mr. Norman of an opportunity at trial to have all of this evidence out in weight, while my opposing counsel made some specific representations that they handled a certain question that there were novice forms or that there were other emails and things like that. Those are exactly the types of things that need to be fully examined at a trial rather than at a summary judgment motion. If there are no further questions from the bench, while there are many references to evidence being weighed and the other very serious authenticity issues in this, they're covered in the brief and closely tracked to the record. Great. Thank you. Thank you. And we thank both counsel for the briefing and argument. This case is submitted.
judges: THOMAS, BRESS, MENDOZA